## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**KASHYAP P. PATEL**, an individual,
c/o Binnall Law Group
717 King Street, Suite 200
Alexandria, Virginia 22314,

       **Plaintiff,**

**v.**

**JESSIE LIU**, an individual,
c/o United States Attorney's Office for the
District of Columbia
601 D Street, NW
Washington, DC 20001;

**ROD ROSENSTEIN**, an individual,
c/o United States Attorney's Office for the
District of Columbia
601 D Street, NW
Washington, DC 20001;

**ROBERT HUR**, an individual,
c/o United States Attorney's Office for the
District of Columbia
601 D Street, NW
Washington, DC 20001;

**ED O'CALLAHAN**, an individual,
c/o United States Attorney's Office for the
District of Columbia
601 D Street, NW
Washington, DC 20001;

**CHRIS WRAY**, an individual,
c/o United States Attorney's Office for the
District of Columbia
601 D Street, NW
Washington, DC 20001;

Case No.: _____

<u>**COMPLAINT**</u>

<u>**JURY TRIAL DEMANDED**</u>

**JOHN DOE 1**, an individual;

and

**JOHN DOE 2**, an individual;

            **Defendants.**

## <u>COMPLAINT</u>

1.     Who watches the watchmen? In our post-PATRIOT Act world, where the U.S. Government has been repeatedly exposed for spying on its own people, and the awesome and chilling power of our federal law enforcement agencies has been weaponized against the American people, there is no more important question. In 2017, after it was discovered that the FBI had opened an unprecedented investigation into President Trump's campaign, the House Permanent Select Committee on Intelligence ("HPSCI"), under the leadership of Congressman Devin Nunes, attempted to provide some much-needed oversight. Plaintiff, Kashyap "Kash" Patel, was Senior Counsel and Chief Investigator for the HPSCI, and was responsible for investigating the questionable conduct of the FBI and DOJ. The watchmen, as it turned out, did not like being watched.

2.     On November 20, 2017, while Mr. Patel was still in his role as Senior Counsel and Chief Investigator for the HPSCI, the United States Department of Justice ("DOJ") secretly sought a grand jury subpoena to compel Google to turn over Mr. Patel's private email account data. They did so in complete contravention of the Fourth Amendment to the U.S. Constitution, which guarantees against unreasonable search and seizure.

3.      The FBI and DOJ had reason to fear the oversight of the HPSCI, as Mr. Patel had already discovered that Crossfire Hurricane was opened under questionable circumstances and improperly sustained by the infamous and unsubstantiated Steele Dossier, which was paid for by the Clinton campaign and the Democratic National Committee ("DNC"). He further found that this critical information was not adequately presented to the Foreign Intelligence Surveillance Court ("FISC") when seeking Foreign Intelligence Surveillance Act ("FISA") warrants.

4.      DOJ sought the subpoena for Mr. Patel's private accounts without a legitimate basis in a chilling attempt to surveil the person leading the Legislative Branch's investigation into the Department of Justice's conduct during the Crossfire Hurricane investigation. This was a blatant abuse and violation of the separation of powers by DOJ, a violation of Mr. Patel's constitutional rights, and an attempt to find a way to silence an investigation into DOJ's questionable conduct, as detailed below. DOJ couldn't subpoena Mr. Patel's official accounts without sparking a public, political and legal battle; thus, they went for his personal accounts, in a non-public and unconstitutional manner, seeking dirt on Mr. Patel.

5.      The illegitimate grounds for the subpoena were made clear when, shortly after the FBI and DOJ previewed what would become the "Nunes Memo," which outlined significant issues with FBI's and the DOJ's  manner of opening and conducting the Crossfire Hurricane investigation, then-Deputy Attorney General Rod Rosenstein ("DAG Rosenstein") threatened to subpoena the records of the House

Permanent Select Intelligence Committee staff, including Mr. Patel, during a closed-door meeting about producing documents requested by the Committee for their investigation into DOJ's and the FBI's, its subagency, conduct in the Crossfire Hurricane investigation.

6.     The Department of Justice attempted to defend against the allegation of this threat to Legislative Branch employees, but admitted, at a minimum, that DAG Rosenstein did threaten to subpoena records of Congressional staff in contempt proceedings over the DOJ's noncompliance with multiple subpoenas. Regardless, this characterization was disputed by multiple Committee staffers, and the matter was referred to the House General Counsel and Speaker of the House as a threat to subpoena records of staffers to halt their investigation.

7.     DAG Rosenstein made this threat in January of 2018, approximately one month after his Department of Justice had already subpoenaed Mr. Patel's email records from Google. This confrontation establishes that DAG Rosenstein and other Defendants were searching for a reason to subpoena Mr. Patel's official accounts as well as the personal ones that DOJ was already improperly pursuing.

8.     Notably, this threat came only a month before the infamous "Nunes Memo" was publicly released, but *after* it had already been circulated to the FBI and DOJ for their review and consideration. The four-page Nunes Memo was aggressively critical of the DOJ and FBI handling of the Crossfire Hurricane investigation. The Nunes Memo specifically called out multiple actions by the FBI and DOJ, and

specifically named DAG Rosenstein twice in relation to questionable conduct relating to the conduct of the Crossfire Hurricane investigation.

9.     The Durham Report, released in early May 2023, was also sharply critical of Crossfire Hurricane and found that the FBI and DOJ didn't appear to have "any actual evidence of collusion in their holdings at the commencement of the Crossfire Hurricane investigation." Indeed, the FBI and DOJ never found any actual evidence of collusion with Russia and had zero evidence to launch the investigation or to support their secret FISA warrants. In light of this, it is even more clear that the FBI and DOJ did not want Mr. Patel to expose their malfeasance, and their actions to search his private email were a political and retaliatory act. The FBI and DOJ violated of Mr. Patel's rights under the Fourth Amendment and directly assaulted Congress's Article I powers, as wielded by HPSCI, by attempting to interfere with the Legislative Branch's oversight of the FBI and DOJ.

10.    This *Bivens* action seeks accountability and damages from the FBI and DOJ for these wrongs committed against Mr. Patel through its agents, as well as injunctive and declaratory relief to ensure the Department of Justice and its agents never take such an unconstitutional and chilling action again. Specifically, Mr. Patel seeks relief herein for the FBI and DOJ's violations of his constitutional and other legal rights in connection with this wrongful investigation into someone they viewed as a political opponent and threat to its improper investigation into President Trump's campaign.

11.     The FBI and DOJ, through their agents, improperly and politically targeted Mr. Patel's personal records because of his official position and actions in furtherance of the United States House of Representatives' lawful investigation into the Department of Justice's handling of the Crossfire Hurricane investigation. It is particularly troubling and a clear violation of Mr. Patel's Fourth Amendment rights that the FBI and DOJ agents would seek Mr. Patel's personal information due to his role in a legitimate oversight investigation. Moreover, it is a shocking and troubling violation of the separation of powers that the FBI and DOJ, through its agents, refused to comply with and instead sought retribution against those carrying out said investigation initiated in the Legislative Branch. Mr. Patel is entitled to relief for the FBI and DOJ's unjustified and illegal actions in violation of his constitutional rights. Moreover, a strong statement must be made condemning the partisan, improper, and unconstitutional actions to prevent repetition of this egregious conduct.

## PARTIES

12.     Plaintiff Kashyap P. Patel is an individual who is a resident and citizen of the State of Nevada. At the time of the events and allegations in this Complaint, Mr. Patel served as Senior Counsel and Chief Investigator for the House Permanent Select Committee on Intelligence, where he spearheaded the investigation into the Russian active measures campaign to influence the 2016 presidential election. Concurrently, he oversaw sensitive programs for the United States Intelligence Community and Special Operations Forces, and he worked to enact legislation to fully

fund the multi-billion-dollar budgets supporting intelligence and counterterrorism operations worldwide.

13.   Defendant Jessie Liu was the United States Attorney for the District of Columbia at the time in question. Under her authority, the application for the grand jury subpoena was improperly sought for Mr. Patel's personal records.

14.   Defendant Rod Rosenstein was Deputy Attorney General at the time in question. Mr. Rosenstein directly threatened Mr. Patel and other HPSCI staffers and was involved in the approval of the application for the grand jury subpoena.

15.   Defendant Robert Hur was the top advisor to Mr. Rosenstein at the time in question. Mr. Hur was involved in the approval of the application for the grand jury subpoena.

16.   Defendant Ed O'Callahan was the Principal Associate Deputy Attorney General for Mr. Rosenstein at the time in question. Mr. O'Callahan was involved in the approval of the application for the grand jury subpoena.

17.   Defendant Chris Wray was the Director of the FBI at the time in question. Mr. Wray was involved in the approval of the application for the grand jury subpoena.

18.   Defendant John Doe 1 was an Assistant United States Attorney for the District of Columbia at the time in question. Doe issued the grand jury subpoena to Google.

19.     Defendant John Doe 2 was a special agent for the FBI who swore out the affidavit in support of the search warrant for Mr. Patel's personal account information.

## JURISDICTION AND VENUE

20.     Mr. Patel brings this case pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and this Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because the claim arises under federal law and agents of the United States, acting in their official capacities, are defendants.

21.     This Court has personal jurisdiction over the individual defendants who reside outside the District of Columbia, pursuant to D.C. Code § 13-423(a)(3), as Plaintiff's claims for relief arise from their acts, directly or by an agent, causing tortious injury in the District of Columbia by an act or omission in the District of Columbia.

22.     This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) as a substantial amount of events giving rise to this claim occurred within this District.

## FACTUAL BACKGROUND
### History of Mr. Patel

23.     Mr. Patel joined HPSCI following his tenure as a counterterrorism prosecutor at the Department of Justice, where he led investigations spanning multiple theaters of conflict and oversaw the successful prosecution of criminals aligned with Al-Qa'ida, ISIS, and other terror groups.

24.     Mr. Patel also served as the DOJ Liaison Officer to Joint Special Operations Command ("JSOC"), working with our nation's most prestigious counterterrorism units to conduct collaborative global targeting operations against high-value terrorism targets.

25.     Mr. Patel left DOJ to join HPSCI specifically to lead the HPSCI investigation into the Russian active measures campaign and conduct oversight of the intelligence community. Mr. Patel was uniquely suited for this position, given his background as a trial lawyer and experience with the intelligence community.

**Crossfire Hurricane: The Improper Trump-Russia Investigation**

26.     During the 2016 presidential election, DOJ and the FBI began an investigation into President Donald J. Trump's presidential campaign regarding false allegations that the Trump campaign had somehow colluded with Russia.

27.     As we now know from the HPSCI report, the DOJ Inspector General's report, and Special Counsel John Durham's report, DOJ and the FBI opened the Crossfire Hurricane investigation due to a biased predisposition and based on raw, unverified intelligence that bore no relation to the facts possessed by United States intelligence agencies. In fact, the Crossfire Hurricane investigation was opened on the basis of a single piece of raw intelligence—a tip from an Australian diplomat, containing multiple layers of vague hearsay, about a barroom conversation from months prior—that was not adequately processed or investigated by the FBI or DOJ before the investigation was opened.

28.     If this piece of raw intelligence was adequately investigated, the FBI would have found that there was not a single piece of intelligence in the possession of any United States intelligence or law enforcement agency that supported any allegation of improper or suspicious contact between the Trump Campaign and any Russian operatives.

29.     Rather than investigating the unsubstantiated and ambiguous tip, and without even speaking with the sources of the information, Deputy Director of the FBI Andrew McCabe directed Deputy Assistant Director of the Counterintelligence Division Peter Strzok to open a full investigation.

30.     The speed and reckless abandon with which the FBI and DOJ opened the Crossfire Hurricane investigation stands in stark contrast to how the FBI and DOJ handled other politically sensitive investigations. As detailed in the Durham Report, the FBI and DOJ refused to investigate the Clinton Campaign based on much stronger intelligence, including a referral from the CIA asking for an investigation by the FBI.

31.     Once the investigation was opened, the FBI began investigating and quickly opened four additional investigations under the Crossfire Hurricane umbrella investigation. These investigations focused on Dr. Carter Page, George Papadopoulos, Lt. Gen. Michael Flynn, and Paul Manafort.

32.     In furtherance of these investigations, the FBI and DOJ sought to obtain a FISA warrant authorizing the electronic surveillance of Dr. Carter Page. The FBI

Office of General Counsel determined that, at that time, there was insufficient evidence to support such a FISA warrant and declined to pursue the warrant in court.

33.     On September 19, 2016, the same day that the FBI team received the initial reports of what would become the Steele Dossier, the FBI investigative team re-engaged with the FBI Office of General Counsel about seeking a FISA warrant.

34.     Two days later, the FBI Office of the General Counsel decided that it would now support the FBI investigative team's request for a FISA warrant.

35.     On October 21, 2016, DOJ and the FBI sought and received a FISA warrant from the FISA court authorizing electronic surveillance on Carter Page.

36.     In a nearly incomprehensible footnote to the FISA warrant application, the FBI included a notation that it claims revealed the bombshell that the Steele Dossier information, which accounted for about half of the information in the FISA warrant application, was financed by the Clinton campaign, which funneled the funds through its law firm, Perkins Coie, to Fusion GPS, an opposition research firm, to Christopher Steele.

37.     The FBI has repeatedly maintained that it was fully transparent with the FISA court, yet the FISA court disagreed and, in a rare move, publicly criticized the FBI for its handling of the FISA applications and renewals in 2019.

38.     After Special Counsel Robert Mueller took over the Crossfire Hurricane investigation, it resulted in the Mueller Report. Then-Attorney General William Barr, in a report provided to Congress summarizing the Mueller Report, stated, "The Special Counsel's investigation did not find that the Trump campaign or anyone

associated with it conspired or coordinated with Russia in its efforts to influence the 2016 US. presidential election."

### The House Permanent Select Intelligence Committee Investigation

39.　　In early 2017, HPSCI began its own investigation into the Russian active measures campaign, attempting to understand the FBI and DOJ's handling of the information, opening of the Crossfire Hurricane investigation, and conduct of that investigation.

40.　　In April 2017, Mr. Patel left his position as a prosecutor with the Department of Justice and joined HPSCI to lead that investigation and conduct oversight of the intelligence community.

41.　　Mr. Patel's first course of action was quite simple: gather an initial list of all the people that would need to be deposed and all of the records that would need to be requested or subpoenaed for the investigation.

42.　　The FBI and DOJ initially were only willing to grant read access to the FISA applications and underlying intelligence, including the Steele Dossier, to Mr. Patel. After reviewing the documents, Mr. Patel immediately knew that there had been serious issues with the FISA applications, later confirmed by the HPSCI report, FISA court, and the Durham Report.

43.　　Mr. Patel and the HPSCI staff directly approached the FBI and DOJ staff and attempted to work collaboratively in furtherance of their investigation.

44.　　Unfortunately, several of the FBI and DOJ staff members with whom Mr. Patel and the HPSCI communicated, including Mr. Rosenstein, among others,

were knee-deep in the Crossfire Hurricane investigation's questionable history and had no interest in assisting the House's oversight investigation. Rather, these high-level operatives sought to obstruct the investigation in every way possible.

45.    The FBI and DOJ simply ignored multiple requests for information and, later, subpoenas. It wasn't until the House threatened to withhold funding that progress was finally made on sharing information and documents for review. Yet, even this modicum of compliance was made as difficult as possible with heavily redacted documents and terse exchanges.

46.    Despite this obstruction, Mr. Patel and the HPSCI staff quickly uncovered that the initial FISA warrant was based, in significant part, on the unsubstantiated dossier authored by Christopher Steele and paid for by the Democratic National Committee and the Hillary Clinton Campaign.

47.    As Deputy Director Andrew McCabe disclosed and the DOJ Inspector General Report confirmed, the warrant would not have been obtained but for the Steele dossier. In fact, it was not until the initial reporting by Steele was in hand that the FBI General Counsel's office approved seeking a FISA warrant.

48.    Yet, in its initial FISA application, DOJ and the FBI omitted and obfuscated material and relevant information. Mr. Steele was an FBI source who was paid over $160,000 by the DNC and Clinton Campaign to obtain derogatory information on Donald Trump's alleged ties to Russia. Specifically, Mr. Steele was paid via the law firm Perkins Coie and research firm Fusion GPS, both of whom were hired by the Clinton Campaign.

49.     These details about the origin of the information, however, were never fully and adequately disclosed to the FISA court. Nor was information that was directly contradictory to the information presented included for the FISA court to consider. Rather, the FBI and DOJ had cherry-picked information to be presented. It was later discovered that FBI lawyer Kevin Clinesmith even altered an email to change its meaning in support of obtaining FISA warrants. Notably, the FISA warrant that was specifically signed by Rosenstein was, some years later, rescinded by the FISC.

50.     Additionally, Mr. Patel uncovered additional misconduct within DOJ and the FBI, notably malicious text messages between FBI Agent Peter Strzok and FBI Lawyer Lisa Page, with whom Mr. Strzok was having an extramarital affair, in which they made obvious their political biases against President Trump, including having an "insurance policy" against him winning the election.

51.     Even more concerningly, only following an intense meeting with DAG Rosenstein and his top advisor Robert Hur, did the FBI and DOJ agree to release the 302s (official FBI interview reports) of Bruce Ohr's (then an Associate Deputy Attorney General under DAG Rosenstein) meetings with Steele and the "Woods File" information for the FISA applications. The "Woods File" is a requirement under the Woods Procedures and requires that the FBI and DOJ document, in one place, the basis for each factual assertion in an application for approval of electronic surveillance under FISA.

52.     Upon reviewing this information, it was immediately clear to the HPSCI investigative team that there were severe problems with the FISA applications. Bruce Ohr, who had no purview over national security matters, had met with Steele before the FBI began receiving the Steele reporting that led to the Steele dossier. Moreover, Mr. Ohr continued to assist in bringing the Steele information before the FBI over time, even after Steele was no longer a source for the FBI.

53.     Bruce Ohr's involvement in bringing the Steele dossier before the FBI is particularly troublesome because his wife, Nellie Ohr, was working for Fusion GPS, the firm responsible for the reporting of the information.

54.     By the fall of 2017, the HPSCI team was preparing to seek the release of some of its findings in what would become the Nunes Memo. The draft of this memo was shared with multiple people within the FBI and DOJ, including at least DAG Rosenstein, FBI Director Wray, and E.W. "Bill" Priestap, assistant director of the FBI for Counterintelligence.

55.     Notably, the Nunes Memo was circulated before the FBI and DOJ sought the subpoena for Mr. Patel's personal information, and, as is public information, the Nunes Memo was critical of several high-ranking members of the FBI and DOJ that had been trying to impede and obstruct the House's investigation from the beginning.

**DOJ Improperly Subpoenas Mr. Patel's Personal Information**

56.     On November 20, 2017, DOJ, upon approval from all Defendants, who knew or should have known that no probable cause existed, obtained a grand jury

subpoena to access Mr. Patel's personal information as part of a politically motivated investigation.

57.     This process involved DAG Rosenstein acting with Hur, O'Callahan, and Wray to approve obtaining the subpoena, and using Liu and Doe to actually obtain the subpoena.

58.     The subpoena sought from Mr. Patel's personal accounts:

   i.   Names, including subscriber names, usernames, and screen names;

   ii.  Addresses, including email addresses, mailing addresses, residential addresses, and business addresses;

   iii. Local and long-distance telephone connection records;

   iv.  Records of session times and durations;

   v.   Length of service, including start date, and type of service utilized;

   vi.  Telephone or instrument numbers, including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers (MEIN), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers (MIN), Subscriber Identity Modules ("SIM"), MSISDN, International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Station Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities, including temporarily assigned network addresses and registration internet protocol ("IP") addresses; and

    viii.  Means and source of payment for such service, including any credit card or bank account number, and billing records.

59.    On or about December 5, 2017, Google provided responses to the subpoena.

60.    Based on the language of the subpoena, the FBI and DOJ sought the same information from multiple other persons and from multiple different providers like Google.

61.    Mr. Patel was wholly unaware of this subpoena until December 12, 2022, when, in line with its policy, Google notified Mr. Patel that DOJ issued it a subpoena for information related to his personal accounts. Exhibit A.

62.    Google further stated that a court order prohibited it from informing Mr. Patel of the subpoena and provided Mr. Patel with additional information regarding the subpoena.

63.    DOJ never had a legitimate basis for obtaining the grand jury subpoena, nor has DOJ ever presented any legitimate basis for investigating Mr. Patel.

64.    Instead, DOJ, through all Defendants, obtained the subpoena as part of a politically-motivated attack on someone who it deemed a significant political threat. Rather than seeking to obtain information openly from Mr. Patel's official accounts, which would have provoked an immediate response and legal fight with the United States House of Representatives, DOJ instead sought—non-publicly and unconstitutionally—to access his private accounts through a third-party subpoena.

They did so to avoid public scrutiny, because they were improperly investigating the man who was investigating them.

### DAG Rosenstein Threatens to Subpoena HPSCI Staff

65.    In January 2018, shortly after DOJ subpoenaed Mr. Patel's personal email records, during a closed-door meeting between DOJ personnel and HPSCI personnel regarding the HPSCI investigation, DAG Rosenstein threatened to subpoena the records of several HPSCI staffers.

66.    DAG Rosenstein criticized the Committee for sending oversight and information requests in writing and was critical of the Committee's request to have DOJ and the FBI respond in writing.

67.    In response to HPSCI's aggressive oversight and the possibility of litigation to resolve DOJ and FBI's lack of cooperation, DAG Rosenstein stated that DOJ is also full of litigators and that they would subpoena the HPSCI staffers' records and emails.

68.    A House committee staffer at the meeting backed up Mr. Patel's account. This staffer told Fox News, "watching the Deputy Attorney General launch a sustained personal attack against a congressional staffer in retaliation for vigorous oversight was astonishing and disheartening."

69.    The staffer went on to state, "having the nation's #1 (for these matters) law enforcement officer threaten to 'subpoena your calls and emails' was downright chilling."

70.    The committee staffer noted that Rosenstein's comment could be interpreted as meaning the department would "vigorously defend a contempt action," which might be expected since the FBI and DOJ had been uncooperative with the investigation. But the staffer continued, "I also read it as a not-so-veiled threat to unleash the full prosecutorial power of the state against us."

71.    As shown by the subpoena issued for Mr. Patel's personal emails, this threat was not so veiled after all.

## CAUSES OF ACTION

### COUNT I
### *BIVENS* ACTION
### Violation of the Fourth Amendment

72.    Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

73.    The Fourth Amendment of the United States Constitution provides that people shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

74.    As described herein, DOJ's unlawful subpoena, reviewed and approved by the Defendants, for Mr. Patel's private personal information represented a violation of the separation of powers and violated his Fourth Amendment rights.

75.    Specifically, the subpoena represented an unreasonable search and seizure of Mr. Patel's private personal information without probable cause.

76.     As a direct and proximate result of DOJ's actions, Mr. Patel suffered harm as a result of the invasion of his constitutionally protected privacy. He is entitled to costs, fees, attorneys' fees, and compensation for other losses.

## PRAYER FOR RELIEF

77.     Mr. Patel respectfully requests this Court enter a judgment in his favor and grant relief against DOJ as follows:

    a.  Compensatory damages in an amount to be determined at trial,

    b.  Reasonable attorneys' fees with respect to all of Plaintiff's causes of action;

    c.  Injunctive relief preventing those agents who improperly investigated Mr. Patel from being involved in future proceedings against him, whether judicial or investigatory;

    d.  Destruction of any and all records that the FBI and DOJ obtained from their subpoena to Mr. Patel; and

    e.  Any other relief the Court deems proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: September 14, 2023               Respectfully submitted,

*/s/ Jason C. Greaves*
Jason C. Greaves, DC Bar No. 1033617
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943

Fax: (703) 888-1930
Email: jason@binnall.com

*Counsel for Plaintiff*