## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KASHYAP P. PATEL**, | |
| Plaintiff, | |
| v. | Case No.: 1:23-cv-02699-APM |
| **JESSIE LIU**, *et al.*, | |
| Defendants. | |

## PLAINTIFF PATEL'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Jason C. Greaves, DC Bar No. 1033617
Shawn Flynn, Bar ID MI0101
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
jason@binnall.com
shawn@binnall.com

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................... ii

BACKGROUND ................................................................................................ 1

ARGUMENT ..................................................................................................... 7

    I.   Mr. Patel has a stated a claim for relief under *Bivens*. ................................ 7

        a.  This case does not involve a new context. ..................................... 7
        b.  There are no special factors counseling against application of *Bivens*. ....... 9

    II.   Defendants are not Entitled to Qualified Immunity. .................................. 13

        a.  The subpoena violated Mr. Patel's constitutional rights. ........................ 14
        b.  Mr. Patel's constitutional rights were clearly established at the time of the violation ................................................................................ 16

    III.  Mr. Patel is entitled to redress. ................................................................ 18

CONCLUSION ................................................................................................. 20

CERTIFICATE OF SERVICE .......................................................................... 21

## TABLE OF AUTHORITIES

### Cases

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*

    403 U.S. 388 (1971) ....................................................................................7, 8, 12, 19

*Black Lives Matter D.C. v. Trump,*

    544 F. Supp. 3d 15, 34 (D.D.C. 2021) ......................................................................18

*Buchanan v. Barr,*

    71 F.4th 1003, 1009 (D.C. Cir. 2023) ......................................................................10

*Carpenter v. United States,*

    585 U.S. 296, 315 (2018) ..........................................................................................17

*Comm. on Judiciary of United States House of Representatives v. McGahn,*

    968 F.3d 755, 772 (D.C. Cir. 2020) ....................................................................10, 13

*Correctional Services Corp. v. Malesko,*

    534 U.S. 61, 71, 74 (2001) ........................................................................................11

*Deaver v. Seymore,*

    822 F.3d 499 (D.C. Cir. 2011) ..................................................................................19

*DeBrew v. Atwood,*

    792 F.3d 118, 125 (D.C. Cir. 2015) ..........................................................................18

*Egbert v. Boule,*

    596 U.S. 482, 492 (2022) ...........................................................................7, 9, 10, 11

*Hale v. Henkel,*

    201 U.S. 43, 76 (1906) ........................................................................................14

*Jacobs v. Alam,*

    915 F.3d 1028, 1038 (6th Cir. 2019) ....................................................................9

*Kisela v. Hughes,*

    584 U.S. 100, 104 (2018) ..............................................................................13, 17

*Lujan v. Defenders of Wildlife,*

    504 U.S. 555, 560 (1992) ....................................................................................18

*Mesa v. Hernandez,*

    589 U.S. ----, 140 S. Ct. 735, 744 (2020) ...................................................8, 9, 10

*Meshal v. Higgenbotham,*

    804 F.3d 417, 429 (D.C. Cir. 2015) (Kavanaugh, J., concurring)............7, 10, 11, 12

*Pearson v. Callahan,*

    555 U.S. 223, 236 (2009) ....................................................................................13

*Saucier v. Katz,*

    533 U.S. 194, 204 (2001) ....................................................................................13

*United States v. Calandra,*

    414 U.S. 338, 346 (1974) ....................................................................................14

*United States v. Dionisio,*

    410 U.S. 1, 11-12 (1973) ..............................................................................14, 15, 16

*United States v. R. Enters., Inc.,*

    498 U.S. 292, 297 (1991) ..............................................................................14, 16

*White v. Pauly,*

  580 U.S. 73, 78-79 (2017) ...................................................................................13, 17

*Wyo. v. Houghton,*

  526 U.S. 295, 300 (1999) ........................................................................................14

*Ziglar v. Abbasi,*

  582 U.S. 120, 137 S. Ct., 1843, 1856–1858 (2017) ...............................................9, 10

### U.S. Constitution

U.S. Const. amend. IV ...................................................................................................14

Under the mistaken belief that they were above the law, Defendants committed a historic abuse of power when violating Kashyap Patel's constitutional rights. After Mr. Patel, while working in Congress, began investigating Defendants' conduct, Defendants threatened, and ultimately followed through on the threat, to subpoena Mr. Patel's personal emails. Indeed, Defendants sought dirt on Mr. Patel in retribution for his lawful investigation into their own conduct. This sort of abuse of power is the type that *Bivens* actions seek to prevent and does not cloak Defendants with any immunity. Accordingly, Mr. Patel respectfully requests that this Court deny Defendants' Motion to Dismiss so that Mr. Patel can hold them accountable for their blatant violation of his rights.

## BACKGROUND

In 2017, after it was discovered that the FBI had opened an unprecedented investigation into President Trump's campaign, the United States House Permanent Select Committee on Intelligence ("HPSCI"), under the leadership of Congressman Devin Nunes, attempted to provide much-needed oversight. Dkt. No. 1 at ¶ 1. Plaintiff, Kashyap "Kash" Patel, was Senior Counsel and Chief Investigator for the HPSCI, and was responsible for investigating the questionable conduct of the FBI and the Department of Justice ("DOJ"). *Id.* On November 20, 2017, while Mr. Patel was Senior Counsel and Chief Investigator for HPSCI, DOJ secretly sought a grand jury subpoena to compel Google to turn over Mr. Patel's *private* email account data. *Id.* at ¶ 2. They did so in contravention of the Fourth Amendment to the United States

1

Constitution, which guarantees against unreasonable search and seizure. *Id.* DOJ sought the subpoena for Mr. Patel's *private* accounts without a legitimate basis in a chilling attempt to surveil the person leading the Legislative Branch's investigation into the DOJ's conduct. *Id.* at ¶ 4.

Mr. Patel joined HPSCI following his tenure as a counterterrorism prosecutor at the DOJ, where he led investigations spanning multiple theaters of conflict and oversaw the successful prosecution of criminals aligned with Al-Qa'ida, ISIS, and other terror groups. *Id.* at ¶ 23. Mr. Patel left DOJ to join HPSCI specifically to lead the HPSCI investigation into the Russian active measures campaign and conduct oversight of the intelligence community. *Id.* at ¶ 25.

During the 2016 presidential election, DOJ and the FBI began an investigation into President Donald J. Trump's presidential campaign regarding false allegations that the Trump campaign had somehow colluded with Russia. *Id.* at ¶ 26. As we now know from the HPSCI report, the DOJ Inspector General's report, and Special Counsel John Durham's report, the DOJ and FBI opened the Crossfire Hurricane investigation due to a biased predisposition and based on raw, unverified intelligence that bore no relation to the facts possessed by United States intelligence agencies. *Id.* at ¶ 27. The speed and reckless abandon with which the FBI and DOJ opened the fabricated Crossfire Hurricane investigation stands in stark contrast to how the FBI and DOJ handled other politically sensitive investigations. *Id.* at ¶ 30.

Once the investigation was opened, the FBI began investigating and quickly opened four additional investigations under the Crossfire Hurricane umbrella

investigation. *Id.* at ¶ 31. In furtherance of these investigations, the FBI and DOJ sought to obtain a FISA warrant authorizing the electronic surveillance of Dr. Carter Page. *Id.* at ¶ 32. The FBI Office of General Counsel determined, at that time, that there was insufficient evidence to support such a FISA warrant and declined to pursue the warrant in court. *Id.* On September 19, 2016, the same day the FBI team received the initial reports of what would become the Steele Dossier, the FBI investigative team re-engaged with the FBI Office of General Counsel seeking a FISA warrant. *Id.* at ¶ 33. Two days later, the FBI Office of the General Counsel decided it would now support the FBI investigative team's request for a FISA warrant. *Id.* at ¶ 34.

On October 21, 2016, the DOJ and FBI sought and received a FISA warrant from the FISA court authorizing electronic surveillance on Dr. Carter Page. *Id.* at ¶ 35. In a nearly incomprehensible footnote on the FISA warrant application, the FBI included a notation revealing that the Steele Dossier information, which accounted for about half of the information in the FISA warrant application, was financed by the Clinton campaign, which funneled the funds through its law firm, Perkins Coie, to Fusion GPS, an opposition research firm, to Christopher Steele. *Id.* at ¶ 36.

In early 2017, HPSCI began its own investigation into the Russian active measures campaign, attempting to understand the FBI and DOJ's handling of the information, the opening of the Crossfire Hurricane investigation, and the agencies' conduct of that investigation. *Id.* at ¶ 39. Mr. Patel's first course of action was quite simple: gather an initial list of all personnel to depose and all records to request or

subpoena for the investigation. *Id.* at ¶ 41. The FBI and DOJ initially were only willing to grant Mr. Patel read access to the FISA applications and underlying intelligence, including the Steele Dossier. *Id.* at ¶ 42. After reviewing the documents, Mr. Patel immediately knew there had been serious issues with the propriety of FISA applications, later confirmed by the HPSCI report, FISA court, and the Durham Report. *Id.*

Mr. Patel and the HPSCI staff directly approached the FBI and DOJ staff and attempted to work collaboratively in furtherance of their investigation. *Id.* at ¶ 43. Unfortunately, several of the FBI and DOJ staff members with whom Mr. Patel and the HPSCI communicated were knee-deep in the Crossfire Hurricane investigation's questionable history and had no interest in assisting the House's oversight investigation. *Id.* at ¶ 44. The FBI and DOJ simply ignored multiple requests for information and, later, subpoenas. *Id.* at ¶ 45. Despite this obstruction, Mr. Patel and the HPSCI staff quickly uncovered that the initial FISA warrant was based, in significant part, on the unsubstantiated dossier authored by Christopher Steele and paid for by the Hillary Clinton Campaign. *Id.* at ¶ 46.

Additionally, Mr. Patel uncovered additional misconduct within DOJ and the FBI, notably malicious text messages between FBI Agent Peter Strzok and FBI Lawyer Lisa Page, with whom Mr. Strzok was having an extramarital affair, in which they made obvious their political biases against President Trump, including having an "insurance policy" against him winning the 2020 presidential election. *Id.* at ¶ 50. Even more disconcerting, after an intense meeting with DAG Rosenstein and his top

advisor Robert Hur, only then did the FBI and DOJ agree to release the 302s (official FBI interview reports) of Bruce Ohr's (at that time an Associate Deputy Attorney General under DAG Rosenstein) meetings with Steele and the "Woods File" information for the FISA applications. *Id.* at ¶ 51. Upon reviewing this information, the HPSCI investigative team immediately and clearly understood that there were severe improprieties with the FISA applications. ¶ 52.

By the fall of 2017, the HPSCI team was preparing to seek the release of some of its findings in what would become the Nunes Memo. *Id.* at ¶ 54. The draft of this memo was shared with multiple people within the FBI and DOJ, including DAG Rosenstein, FBI Director Wray, and E.W. "Bill" Priestap, Assistant Director of the FBI for Counterintelligence. *Id.* Notably, the Nunes Memo had circulated before the FBI and DOJ sought the subpoena for Mr. Patel's personal information, and, as is public information, the Nunes Memo was critical of several high-ranking members of the FBI and DOJ who had been trying to impede and obstruct the House's investigation from the beginning. *Id.* at ¶ 55.

On November 20, 2017, DOJ, upon approval from all Defendants, who knew or should have known that no probable cause existed, obtained a grand jury subpoena to access Mr. Patel's *personal account information* as part of a politically motivated investigation. *Id.* at ¶ 56. On or about December 5, 2017, Google provided responses to the subpoena. *Id.* at ¶ 59.

Mr. Patel was wholly unaware of this retaliatory and baseless subpoena until December 12, 2022, when, in line with its policy, Google notified Mr. Patel that DOJ

had issued it a subpoena for information related to his personal accounts. *Id.* at ¶ 61. DOJ never had a legitimate basis for obtaining the grand jury subpoena, nor has DOJ ever presented any legitimate bases for investigating Mr. Patel or his personal accounts. *Id.* at ¶ 63. Instead, DOJ, through all Defendants, obtained the subpoena as part of a politically motivated attack on someone who it deemed a significant political threat. Rather than seeking to obtain information from Mr. Patel's official accounts, which would have provoked an immediate response and legal fight with the United States House of Representatives, DOJ instead sought—non-publicly and unconstitutionally—to access his private accounts through a third-party subpoena. *Id.* at ¶ 64. They did so to avoid public scrutiny because they were improperly investigating the man who was investigating them. *Id.*

In January 2018, shortly after DOJ subpoenaed Mr. Patel's personal email records, during a closed-door meeting between DOJ personnel and HPSCI personnel regarding the HPSCI investigation, DAG Rosenstein threatened to subpoena the records of several HPSCI staffers. *Id.* at ¶ 65. DAG Rosenstein criticized the Committee for sending oversight and information requests in writing and was critical of the Committee's request to have DOJ and the FBI respond in writing. *Id.* at ¶ 66. In response to HPSCI's aggressive oversight and the possibility of litigation to resolve DOJ and FBI's lack of cooperation, DAG Rosenstein stated that DOJ is also full of litigators and that they would subpoena the HPSCI staffers' records and emails. *Id.* at ¶ 67. As shown by the subpoena issued for Mr. Patel's personal emails, this threat

was not so veiled after all. *Id.* at ¶ 71. Accordingly, Mr. Patel now seeks to hold Defendants accountable for their blatant and historic abuse of power.

## ARGUMENT

### I.    Mr. Patel has a stated a claim for relief under *Bivens*.

In determining whether a plaintiff has a cause of action under *Bivens*, courts generally employ a two-step inquiry. *Egbert v. Boule*, 596 U.S. 482, 492 (2022). The first question is whether it is a "new" *Bivens* context. *Id.* As described below, it is not. Regardless, even if it is a new context, the second factor is whether there are special factors indicating that Congress is better equipped to create a damages claim than the courts. *Id.* Because this matter involves an intrusion on Congress itself, this Court is better equipped to handle any remedies in this situation to avoid separation of powers issues. Accordingly, Mr. Patel has a proper cause of action under *Bivens*.

####     a.    This case does not involve a new context.

As Judge Kavanaugh wrote, "The classic Bivens case entails a suit alleging an unreasonable search or seizure by a federal officer in violation of the Fourth Amendment." *Meshal v. Higgenbotham*, 804 F.3d 417, 429 (D.C. Cir. 2015) (Kavanaugh, J., concurring) (citing *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)). In *Bivens*, the complaint alleged that six Federal Bureau of Narcotics agents, acting with federal authority, entered the plaintiff's apartment, searched the apartment, and arrested him without a warrant. *Bivens*, 403 U.S. at 389. As the Supreme Court recognized, the Fourth Amendment

"guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority." *Id.* at 392.

This acts as a limitation on federal power. *Id.* at 394. And damages are an "ordinary" remedy for this sort of invasion. *Id.* at 395. Thus, if a plaintiff can show a violation of the Fourth Amendment, and there are no special factors indicating that it is an area in which Congress is best suited to provide a remedy, such as "federal fiscal policy," then the plaintiff is entitled to damages. *Id.* at 396.

Likewise, here, Mr. Patel has properly alleged that several members of DOJ and the FBI improperly subpoenaed Mr. Patel's private personal information in violation of his Fourth Amendment rights. Dkt. No. 1 at ¶¶ 74-75. Indeed, Defendants obtained this subpoena for improper reasons, which were retaliatory and motivated by Mr. Patel's involvement in the then-ongoing investigation of DOJ and the FBI. Defendants threatened to, and, in fact, did, subpoena Mr. Patel's personal account information. *Id.* at ¶¶ 65-71. Indeed, this involves "[t]he classic *Bivens* case" in that it obviously involves an unreasonable search in violation of the Fourth Amendment. "*Bivens* concerned an allegedly unconstitutional arrest and search carried out in New York City." *Mesa v. Hernandez*, 589 U.S. ----, 140 S. Ct. 735, 744 (2020). This case involves an unconstitutional search in the District of Columbia. Simply put, it is not meaningfully different.

Defendants hang their hats on *Abbasi*, but as Justice Ginsburg wrote, "Though the Court has more recently declined to extend Bivens to new contexts [in *Abbasi*],

Bivens remains the law of the land in settings in which the decision has been held to apply." *Hernandez*, 140 S. Ct. at 755 (Ginsburg, J., dissenting) (citing *Ziglar v. Abbasi,* 582 U.S. 120, 137 S. Ct., 1843, 1856–1858 (2017)). Indeed, *Abbasi* explicitly held that "this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose." *Abbasi*, 582 U.S. at 134. The Sixth Circuit, relying on this language in *Abbasi*, recently upheld a finding that *Bivens* applied to "run-of-the-mill challenges to 'standard law enforcement operations'" because these challenges "fall well within *Bivens*." *Jacobs v. Alam,* 915 F.3d 1028, 1038 (6th Cir. 2019). The same logic applies here, in that a subpoena is a "run-of-the-mill" standard law enforcement operation. Accordingly, this is not a new context, and there is no need to analyze any special factors. Defendants' attempts to severely narrow *Bivens'* application goes beyond the Supreme Court's holding in *Abbasi*, which is not meant to cast doubt on the "necessity" of *Bivens*.

> **b.** **There are no special factors counseling against application of *Bivens*.**

Even if this case provides a new context, *Bivens* still applies because there are no special factors cautioning the Court against providing a remedy. The essential question is "whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 596 U.S. at 492. In recent Supreme Court cases, on which Defendants heavily rely, the Supreme Court has found special factors counseling against *Bivens* applying because they involved a national security context. *See Abbasi*, 582 U.S. at 125-26 (involving post 9/11 detention claims from

9

illegal aliens); *Egbert*, 596 U.S. at 486-87 (involving a dispute at an international border); *Hernandez*, 140 S. Ct. at 749 (involving a border patrol shooting on the Mexican border); *see also Meshal*, 804 F.3d at 421-22 (citing cases within this Circuit and others wherein the courts have declined to extend *Bivens* because it involved a national security context); *Buchanan v. Barr*, 71 F.4th 1003, 1009 (D.C. Cir. 2023) (declining to extend *Bivens* because the issue implicated national security).

Unlike these cases, this case does not involve a national security dispute. Instead, this case involves the unconstitutional surveillance of a congressional staffer. This sort of unconstitutional conduct is the exact sort of conduct that this Court is equipped to handle. This case involves an alleged unconstitutional subpoena. As the D.C. Circuit held, "subpoena enforcement is a familiar judicial exercise." *Comm. on Judiciary of United States House of Representatives v. McGahn*, 968 F.3d 755, 772 (D.C. Cir. 2020) (citations omitted). Accordingly, it is commonplace for the courts, not Congress, to handle disputes regarding subpoenas.

Further, if Congress were to pass a remedy against subpoenas to its employees, it would undoubtedly be met with public backlash and be seen as an abuse of power. It would create the optics that Congress is making itself untouchable. Accordingly, the onus is on the courts to provide a remedy for this sort of unconstitutional conduct. To be sure, "the most important question is who should decide whether to provide for a damages remedy, Congress or the courts?". *Hernandez*, 140 S. Ct. at 750 (internal quotation marks omitted). While the answer is rarely the courts, this case presents one of those rare instances.

Additionally, the D.C. Circuit recently listed Supreme Court cases with special factors also counseling against applying *Bivens*:

> 1) a federal employee's claim that his federal employer demoted him in violation of the First Amendment, *Bush v. Lucas*, 462 U.S. 367, 368–69, 103 S. Ct. 2404, 76 L.Ed.2d 648 (1983); 2) a claim by military personnel that military superiors violated various constitutional provisions, *Chappell v. Wallace*, 462 U.S. 296, 298–300, 103 S. Ct. 2362, 76 L.Ed.2d 586 (1983); 3) a claim by Social Security disability benefits recipients that benefits had been denied in violation of the Fifth Amendment, *Schweiker v. Chilicky*, 487 U.S. 412, 414, 108 S. Ct. 2460, 101 L.Ed.2d 370 (1988); 4) a former bank employee's suit against a federal agency, claiming he lost his job due to agency action violating due process, *FDIC v. Meyer*, 510 U.S. 471, 484–86, 114 S. Ct. 996, 127 L.Ed.2d 308 (1994); 5) a prisoner's Eighth Amendment-based suit against a private corporation managing a federal prison, *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 73–74, 122 S. Ct. 515, 151 L.Ed.2d 456 (2001); 6) landowners' claims that government officials unconstitutionally interfered with their property rights, *Wilkie*, 551 U.S. at 554–61, 127 S. Ct. 2588; and 7) a prisoner's Eighth Amendment claim against private prison employees, *Minneci v. Pollard*, —— U.S. ——, 132 S. Ct. 617, 623–26, 181 L.Ed.2d 606 (2012).

*Meshal*, 804 F.3d at 421. Each of these cases involves areas of the law that Congress is either better suited to handle or has already established an alternative remedy. This case, instead, goes to the heart of what *Bivens* sought to accomplish. "*Bivens* 'is concerned solely with deterring the unconstitutional acts of individual officers'—i.e., the focus is whether the Government has put in place safeguards to 'preven[t]' constitutional violations 'from recurring.'" *Egbert*, 596 U.S. at 498 (citing *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71, 74 (2001)). The government has no safeguards in place to protect against an unconstitutional search of a political rival, in the legislative branch. Accordingly, to solve this historic abuse, and separations of

powers issue, the courts are best equipped for "deterring the unconstitutional acts" at play here. *Id*.

Each case must be looked at through a "case-by-case" approach and is "context specific." *Meshal*, 804 F.3d at 422. Given the context here, the only remedy is to apply *Bivens*.

Defendants argue that Congress has likewise established alternative remedies. These remedies that Defendants suggest, however, are not remedies at all for this sort of violation. Defendants argue that under the Stored Wire Electronic Communications Act, a person subject to a subpoena for their private personal emails can move to vacate the court order or to quash the subpoena. This, however, is not a remedy at all in this instance. Indeed, Mr. Patel was unaware of Defendants' conduct until he was given notice five years later. At this point, it was much too late for Mr. Patel to move to quash the subpoena. Further, while non-binding jurisdictions have found The Inspector General Act to be an appropriate remedy, this goes against the purpose of *Bivens*, which is to provide monetary relief for constitutional violations. *Bivens*, 403 U.S. at 397.

Defendants' final two arguments should likewise fail. Defendants argue that the Court should avoid intruding into the decision making of the executive branch, and that the inter-branch dispute should be settled amongst the branches themselves. Dkt. No. 18 at 14-17. While it is important for the executive branch to have some autonomy when committing its investigatory functions, this cannot mean a blank check to investigate those it deems a political opponent for political purposes,

12

as the Complaint properly alleges. Further, while Defendants argue the courts should not interfere with a dispute between the two branches, the D.C. Circuit recently held that the courts may weigh in on subpoena disputes between the branches. *See McGahn*, 968 F.3d at 772-73.

## II.     Defendants are not Entitled to Qualified Immunity.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017)). Prior case law does not need to be "directly on point," but the Supreme Court has stated that for a right to be clearly established, precedent has to have placed that right "beyond debate." *Id.* This means that qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

In *Saucier v. Katz*, the Supreme Court stated that the proper mechanism to evaluate qualified immunity claims involved two steps: (1) whether a constitutional right was violated; and (2) whether the right was "clearly established" at the time of violation. 533 U.S. 194, 204 (2001). While the Court has since held that the process is no longer mandatory and affords the lower courts with discretion, it is still "often appropriate" and "often beneficial." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### a. The subpoena violated Mr. Patel's constitutional rights.

The Complaint properly alleges a constitutional violation. The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The Supreme Court evaluates a Fourth Amendment claim "under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyo. v. Houghton*, 526 U.S. 295, 300 (1999).

Here, the grand jury subpoena was inherently unreasonable under these standards. Defendants are correct to the extent that the Supreme Court has held the government need not usually justify a grand jury subpoena with probable cause because that is the purpose of the subpoena. *See United States v. R. Enters., Inc.,* 498 U.S. 292, 297 (1991); *see also* Dkt. No. 18 at 20. The Supreme Court, however, has also held that "[a] grand jury's subpoena *duces tecum* will be disallowed if it is 'far too sweeping in its terms to be regarded as reasonable' under the Fourth Amendment." *United States v. Calandra*, 414 U.S. 338, 346 (1974) (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)); *see also United States v. Dionisio*, 410 U.S. 1, 11-12 (1973). Further, the Court stated that the "Constitution could not tolerate the

transformation of the grand jury into an instrument of oppression." *Dionisio*, 410 U.S. at 12.

*Dionisio* was in the context of the First Amendment, where the Supreme Court observed that a grand jury could not be used for the purposes of harming a reporter's relationships with sources so his reporting would no longer be seen as valid. *Id.* This is an analogous situation with the Fourth Amendment. Mr. Patel was subjected to this grand jury subpoena simply because he dared to perform the functions of his job, including oversight of the FBI and DOJ. Dkt. No. 1 at ¶¶ 1-4.

The Complaint alleges a constitutional violation like that in *Dionisio*, specifically that the subpoena was "without a legitimate basis in a chilling attempt." Dkt. No. 1 at ¶ 4. In case there was any doubt what Defendants' motives were, after DOJ and the FBI reviewed the Nunes Memo, Deputy Attorney General Rod Rosenstein directly threatened congressional staffers, including Mr. Patel, with subpoenas because of their involvement in the oversight investigation. Dkt. No. 1 at ¶¶ 5-8. The Nunes Memo mentioned Rosenstein by name and was critical of his personal conduct in the Crossfire Hurricane saga. Dkt. No. 1 at ¶ 8. While DOJ had already subpoenaed Mr. Patel's personal records, Rosenstein's hostile words directed toward Congressional staff show he was searching for a reason to gain access to Mr. Patel's records. Dkt. No. 1 at ¶ 7. Even though DOJ attempted to defend against this threat, they admitted that Rosenstein made it while taking issue with contempt proceedings over DOJ's own noncompliance with subpoenas. Dkt. No. 1 at ¶ 6. DOJ's explanation was disputed by several HPSCI staffers and was referred to the House

General Counsel under the allegation that Rosenstein's threat was made specifically to stop the investigation, which it obviously was. Dkt. No. 1 at ¶ 6.

DOJ did not believe Mr. Patel had committed any crimes, and it cannot be shown that they had probable cause, nor were they legitimately using the grand jury to search for probable cause. For that reason, *United States v. R Enters., Inc.* does not fit here.

Defendants should not be able to hide behind qualified immunity and the normal rules of grand jury subpoenas because they are using it as "an instrument of oppression." *Dionisio*, 410 U.S. at 12. This was a blatant violation of individual liberty in an attempt to cover up wrongdoing on DOJ's and the FBI's behalf. Defendants had no legitimate use for things like Mr. Patel's telephone records, subscriber services and names, MAC and IP addresses, Electronic Serial Numbers, and other sensitive information. Dkt. No. 1 at ¶ 58. They simply subpoenaed a sweeping amount of Mr. Patel's records without any legally supportable basis. They were driven by impure and retaliatory motives in an attempt to hide their illegal conduct. The subpoena was patently unreasonable, if not blatantly illegal. Because the Complaint properly alleges the subpoena was unreasonable and a constitutional violation, the first prong is met.

> ### b. Mr. Patel's constitutional rights were clearly established at the time of the violation.

Mr. Patel's rights were clearly established. As stated above, prior case law does not need to be "directly on point," but for a right to be clearly established, precedent

has to have placed that right "beyond debate." *Kisela*, 584 U.S. at 104 (quoting *White*, 580 U.S. at 78-79).

Defendants' reliance on the third-party doctrine is misplaced. *Carpenter v. United States* found that despite turning over cell site location data to third-party wireless carriers, the third-party doctrine did not apply in that case, in part, because of how invasive the data was. 585 U.S. 296, 315 (2018). Defendants insist *Carpenter* does not apply for two reasons: (1) it was not decided until after the subpoena at issue was obtained, and (2) *Carpenter* is limited to cell site location data. *See* Dkt. No. 18 at 24. Despite Defendant's arguments, in light of the invasive nature of Defendants' conduct, Defendants conduct was a clear violation, as *Carpenter* has since acknowledged.

Mr. Patel was subject to a politically motivated and invasive subpoena seeking his *personal* records, simply for performing his job to investigate the DOJ's and FBI's conduct in the Crossfire Hurricane investigation.  In other words, those at DOJ and the FBI who were being investigated for their illegal actions were, in turn, illegally investigating those who were investigating them. Dkt. No. 1 at ¶¶ 56-71.

Defendants' brazen conduct made it quite clear that the subpoena's objective was intended to stop an investigation of their own actions. Dkt. No. 1 at ¶¶ 65-71. Defendants, without any probable cause, were fishing for anything to leverage against Mr. Patel and the HPSCI investigation.

The subpoena itself was broad and invasive, encompassing sensitive data like telephone records, payment methods, IP addresses, Electronic Serial Numbers,

residential addresses, subscriber names, and more. Dkt. No. 1 at ¶ 58. It is hard to envision that such an overbroad, extensive, and baseless acquisition of sensitive personal information, which was clearly actioned to chill government oversight, would not have been a violation of the Fourth Amendment at its framing. Thus, Defendants should be held accountable for deliberately violating Mr. Patel's civil liberties while seeking to bury their own nefarious conduct.

### III.    Mr. Patel is entitled to redress.

To satisfy Article III standing, a plaintiff must demonstrate that they have suffered a "concrete and particularized" harm. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). Here, Mr. Patel suffered such a harm. Defendants illegally took Mr. Patel's private information as retribution for his lawful pursuance of his official duties, and Defendants continue to improperly retain that information. Defendants argue that "'past injuries alone are insufficient to establish standing.'" Dkt. No. 18 at 27 (quoting *Black Lives Matter D.C. v. Trump,* 544 F. Supp. 3d 15, 34 (D.D.C. 2021)). Mr. Patel's harm, however, is not past. Defendants continue to retain the information that they wrongfully took from Mr. Patel. As long as they continue to retain this information, Mr. Patel continues to suffer ongoing harm. *See DeBrew v. Atwood,* 792 F.3d 118, 125 (D.C. Cir. 2015) (holding that a prisoner who alleged that prison guards wrongfully took his property had Article III standing to sue).

This continuing harm can only be resolved by the injunctive relief that Mr. Patel seeks or a declaratory judgment requiring that Defendants delete this information. While a monetary remedy would be difficult to value, this Court may

fashion an appropriate penalty to ensure these government actors and future government actors do not take these actions again. Only by ordering the wrongfully obtained information destroyed, and a suitable monetary fine, can the Court make Plaintiff's privacy rights whole.

Defendants claim that the Court lacks the authority to issue such an order. Dkt. No. 18 at 28. This claim is not based on any binding authority or precedent, but rather in Defendants' misplaced fear that Plaintiff seeks to enjoin Defendants from pursuing future investigations. *See Id.* at 29. What Mr. Patel seeks, however, is to have his privacy restored by the destruction of wrongfully obtained information, and to protect his privacy in the future by barring specific persons from participating in any possible future proceedings. Dkt. No. 1 at ¶ 77.

This plea is not, as Defendants claim, a bar on any future investigations by any part of the Executive Branch. Rather, it is a request that those parties who played a part in violating Mr. Patel's privacy be barred from any future proceeding. It is necessary to bar Defendants from participating in any future proceeding because they cannot be dispossessed of wrongfully obtained information in their minds even after such information is destroyed. Thus, the case frequently cited by Defendants in their motion, *Deaver v. Seymore,* 822 F.3d 499 (D.C. Cir. 2011), does not apply.

Finally, Mr. Patel maintains that he is entitled to monetary relief. Indeed, this sort of relief is ordinary for this type of violation. *Bivens*, 403 U.S. at 395.

## CONCLUSION

Defendants' abuse of power cannot go unanswered. Their actions are not without consequence. Indeed, this sort of abuse is what *Bivens* seeks to protect. Accordingly, for the foregoing reasons, Mr. Patel respectfully requests that this Court deny Defendants' Motion to Dismiss.

Dated: March 15, 2024                    Respectfully submitted,

/s/ Jason C. Greaves
Jason C. Greaves, DC Bar No. 1033617
Shawn Flynn, Bar ID MI0101
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
jason@binnall.com
shawn@binnall.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on March 15, 2024, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

<div style="margin-left:50%">

/s/ Jason C. Greaves
Jason C. Greaves, DC Bar No. 1033617
*Counsel for Plaintiff*

</div>